# IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF ARKANSAS
### NORTHERN DIVISION

FUTUREFUEL CHEMICAL
COMPANY

            Plaintiff

V.                                                    NO:  1:11CV00061  SWW

LONZA, INC.
            Defendants

\* \* \* \* \* \* \* \* \*

## <u>ORDER</u>

FutureFuel Chemical Company ("FFCC") filed this breach of contract action against

Lonza, Inc. ("Lonza") in state court, and Lonza removed on the basis of diversity of citizenship

between the parties and an amount in controversy exceeding $75,000.  Before the Court is

Lonza's motion for summary judgment (docket entries #44, #45, #46, filed under seal), FFCC's

response in opposition (docket entries #47, #48, #49, #50, filed under seal), and Lonza's reply

(docket entry #51, filed under seal).  After careful consideration, and for reasons that follow,

summary judgment is granted in Lonza's favor, and this action is dismissed with prejudice.

## I.

Summary judgment is appropriate when "the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  As a

prerequisite to summary judgment, a moving party must demonstrate "an absence of evidence to

support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Once the moving party has properly supported its motion for summary judgment, the non-

moving party must "do more than simply show there is some metaphysical doubt as to the

material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The non-moving party may not rest on mere allegations or denials of his pleading but must "come forward with 'specific facts showing a genuine issue for trial.'" *Id*. at 587 (quoting Fed. R. Civ. P. 56(e)).   "[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 401 (8th Cir. 1995).

## II.

The following facts are undisputed.[1]  FFCC manufactures and sells chemicals at its facility in Batesville, Arkansas, and Lonza supplies advanced pharmaceutical ingredients and intermediates for the pharmaceutical industry.  During the events at issue in this case, Lonza operated a manufacturing facility in Pennsylvania, hereinafter "Riverside," where it manufactured an advanced intermediate product called trityl losartan ("TTL") for only one customer: Merck Pharmaceuticals ("Merck") .

DEM is a solvent component used in the production of TTL.  Either virgin or  recycled DEM is used to produce TTL, provided that it meets certain specifications.  Prior to 2009, Lonza purchased its DEM requirements from Eastman Chemicals ("Eastman").  Lonza also utilized its own recovered or recycled DEM, but its recovery rates were variable and unreliable.

---

[1]Local Rule 56.1 provides that a party moving for summary judgment must submit a statement of the material facts as to which it contends there is no genuine issue to be tried, and the non-moving party must file a responsive statement of the material facts as to which it contends a genuine issue exists to be tried.  "All material facts set forth in the statement filed by the moving party . . . shall be deemed admitted unless controverted by the statement filed by the non-moving party . . . . " Local Rule 56.1(c).

In early 2008, Lonza learned that Eastman had plans to exit the DEM production business, and it and began looking for a replacement supplier.  In May 2008, Lonza authorized Dr. Marten Luggen ("Luggen"), who worked for Lonza's strategic sourcing custom manufacturing group, to investigate Lambiotte & Cie ("Lambiotte"), a company located in Belgium, and FFCC as potential DEM suppliers.  At that time, Lambiotte was an established DEM supplier, and FFCC had never produced DEM.

 At the same time that Lonza was investigating replacement suppliers, FFCC learned that Eastman was planning to cease production of DEM, and it began exploring the possibility of expanding its business to include DEM production.   FFCC conducted market research and identified known DEM users including BASF, DuPont, and Lonza.

FFCC authorized its representative, Daniel Allgeier ("Allgeier"), to contact Lonza regarding a potential DEM supply opportunity.   On May 16, 2008, Allgeier spoke to Lonza's Jennifer Schauble ("Schauble"), who worked at Riverside as a purchaser.  Allgeier told Schauble that FFCC was taking steps to cover Lonza's DEM requirements for late 2008 and early 2009, and Schauble informed him that Lonza used a DEM recovery system at Riverside, which impacted the amount of DEM Lonza would require.  *See* Def.'s Exs. #4, at 35-36, #14.  Schauble also told Allgeier that (1) Lonza's demand for DEM at that time was between two and five truckloads per month, (2) she could not forecast Lonza's DEM requirements beyond 2009, (3) Lonza's demand for DEM depended on Merck's projected demand for TTL, and (4) Lonza's demand for DEM would decrease in 2010.   *See* Def.'s Ex. #14.

By June 12, 2008, FFCC had developed and approved a plan for entering the DEM production business, which called for a $1.7 million capital expenditure for the construction of a

DEM production facility.  *See* Def's Exs. #12, #13.   According to a document setting forth

FFCC's economic projections for the DEM project, FFCC contemplated revenue from DEM

sales to DuPont, BASF, and Lonza.  *See* Def's Ex. #12.   An  FFCC document titled "DEM

Project Evaluation, June 12, 2008" includes a list of advantages and risks, with the entry:  "must

get long term deal from Lonza." Def's Ex. #12.

On June 17, 2008, Lonza representatives, including Luggen, visited FFCC's Batesville

facility and met with FFCC representatives, including Dr. Slaton Fry ("Fry") and Allgeier.

During those meetings, Allgeier and Fry learned that Lonza's DEM requirements varied

according to the success of Lonza's DEM recycling process.  *See* Allgeier Dep. at 50, Fry Dep.

at 53.  Based on the information that he had obtained, Allgeier assumed that Lonza's need for

DEM existed only because it required DEM to fulfill its supply obligations to Merck.  Allgeier

also understood that the uncertainty surrounding Lonza's DEM requirements presented a risk to

FFCC.[2]

---

[2] The following colloquy is taken from a transcript of Allgeier 's deposition testimony:

> Q:      Did you know prior to August 26, 2009 that Merck was the only customer
>         for Lonza for which it needed DEM?
> A:      I assumed that, yes.
> Q:      Did that cause you to believe that this was any more of a riskier
>         negotiation that you were entering into with Lonza?
> A:      There was risk.
> Q:      To FutureFuel?
> A:      Yes.
> Q:      Was there risk to Lonza as well?
> A:      Yes, of course there's risk.

Def's Ex. #4, Allgeier Dep. at 103.

After the Batesville meeting, Lonza and FFCC agreed to evaluate a potential DEM supply arrangement that would include both a long-term DEM supply agreement and an interim storage solution for Lonza's final purchase of DEM from Eastman.

On July 22, 2008, Fry wrote a letter to Ted Dolan ("Dolan"), the general manager at Riverside, proposing that Lonza and FFCC agree to sign a letter of intent before August 15, 2008, which would describe "in broad terms a future agreement that include[d] the use of FFCC tanks to store products for an interim bridging strategy plus supply of material to Lonza . . . over a longer period of time."  Plf's Ex. #1, Fry Dep., attached Ex. #3.  Fry suggested that the parties agree to complete a formal supply agreement to be executed by October 1, 2008, and he quoted an initial price for FFCC-manufactured DEM that would be valid through October 1, 2008.  *Id.* As for quantity, Fry proposed that FFCC  supply 100%  of Lonza's DEM requirements for its North America operations for years 2009 through 2011.  *Id.*

In deposition, Fry testified that FFCC's  management required that he obtain a commitment from Lonza before he could "begin the project."  Def's Ex. #6, Fry Dep. at 62. According to Fry, FFCC considered pursing an executed supply agreement or a noncancellable purchase order, but it decided to seek a letter of intent because "time was of the essence because Lonza had lost [its] supply."  *Id*. at 63.  Fry also acknowledged that as of July 2008, Lonza's DEM requirements were uncertain.  *Id.*

On July 28, 2008, Luggen, Allgeier, and Fry participated in a teleconference to discuss Fry's July 22 letter.  *See* Plf's Ex. #3, Dolan Dep., attached Ex. #30.  According to Fry's notes from the meeting,  Luggen indicated that FFCC's proposed price was acceptable but Lonza was uncomfortable committing 100% of its DEM requirements to one supplier.  *Id.*  Fry wrote that

Lonza  suggested a minimum purchase of 459 metric tons ("MT") over a two-year period.  Fry's

notes read:

> They have suggested a minimum purchase of 459 MT over a 2 year period in
> response to [FFCC's] proposal for 100% of their North American demand over a 3
> year period. [Luggen] provided a forecast usage of 1800 MT in 2009, 900 MT in
> 2010, and 800 MT in 2010.
>
> The drop in volume is due to expected competition from generic manufacturers for
> the final product. The actual quantity used depends heavily on the recycle rate at
> Lonza's Riverside facility. The 459 MT represents the absolute minimum purchase
> quantity assuming perfect  recovery at Riverside.

*Id*.  Fry's notes state that he and Allgeier required "a few days to think about this counter

proposal before [FFCC] need to respond," and the participants agreed to meet again on July 31,

2008.  *Id*.

> In an e-mail message to Luggen, dated July 29, 2008, Allgeier wrote:
>
> If we can agree that you can commit to the volumes of 1,000 MT for 2009, 700 MT
> for 2010 and 300 MT for 2011, we an offer you the price of $1.38 per pound . . .
> delivered to the Riverside site.  These volumes will allow us to go forward with the
> continuous manufacturing operation and allow for flexibility for additional needs if
> required by changes in your recycling operation.  I look forward to talking with you
> on Thursday about these changes.

Plf.'s Ex. #2, Allgeier Dep., attached Ex. #3.

Luggen reported to Dolan and Schauble that FFCC needed a commitment for

approximately 1700 metric tons of DEM, in total, to justify investing in a new plant for DEM

production.  Luggen also noted that Lonza's requirements from April 2009 through June 2010

were estimated at only  900 metric tons.  *See* Plf's Ex. #3, Dolan Dep, attached Ex. #32.

On July 30, 2008, FFCC sent Lonza a draft letter of intent, dated July 29, 2008, which

included the following statement under the heading Long Term Supply Strategy: " Lonza agrees

to purchase DEM from [FFCC] at the following volumes: 1,000 [MT] tons in 2009, 80% of its

worldwide demand for 2010 and 80% of its worldwide demand for 2011."[3]   Plf's Ex. #1 (Fry

Dep), attached Ex. #7.  The draft LOI provided an initial price of $1.38 per pound or $3.04 per

kilogram for "1,000 [MT] of annual volume," but it also stated that the parties would negotiate

for "annual volumes that are less than or that exceed the 1,000 [MT]."  *Id.*

On July 31, 2008, Luggen, Allgeier, and Fry held a teleconference.  According to

meeting notes prepared by Fry, Luggen indicated that Lonza agreed in principle with the first

draft letter of intent, but he wanted more detail concerning a price/volume curve.  Fry's notes

state: "Lonza is particularly interested in FFCC's thoughts around pricing at annual volumes less

than 1,000 MT/year. [Allgeier and Fry] committed to providing [Luggen] a proposed

price/volume curve by Monday, August 4."  Plf's Ex. #1, Fry Dep., attached Ex. #8.   FFCC

provided a second draft letter of intent dated August 1, 2008, which included a price/volume

chart that provided prices per pound and kilogram based on annual purchases of (1) more than

1250 MT, (2) 1,000 to 1250 MT, (3) 700 to 1,000 MT, (4) 400 to 700 MT, and (5) less than 400

MT.  *See id.*

On August 8, 2008, Luggen and Allgeier conferred by telephone, and Luggen stated that

Lonza's estimated demand for 2009, 2010, and 2011 was only 400 to 500 metric tons.  Meeting

notes prepared by Allgeier state that there is "an upside" because "they have in the past had

difficulty with their recycle process and have had to purchase up to 120 MT per month when the

recycle process was not working as well."  Plf's Ex. #2, attached Ex. #5.  Allgeier's notes

conclude: "Although this seems like a step backward for us, I believe that we will be selling

---

[3]The draft letter of intent also included a section titled "Bridge Strategy" that provided a
plan for FFCC to store DEM that Lonza purchased from Eastman.  *See* Plf's Ex. #1, Fry Dep.,
attached Ex. #7.

between 500 and 700 MT next year and 500 to 600 MT in 2010 and 400 in 2011. This seems more reasonable since they will be reducing the volume of product they are making as the patent expires and they work on keeping the recycling process functioning at the current level." *Id*. Regarding his reference to the expiration of a patent, Allgeier explained in deposition that Luggen reported that Merck's patent for TTL would be expiring, which would reduce Lonza's DEM requirements. *See* Plf's Ex. #2, Allgeier Dep. at 62-64.

On August 25, 2008, FFCC and Lonza representatives signed a letter of intent ("LOI"). *See* Compl., Ex. B. Under the heading "Purpose," the LOI provided:

> Based upon our discussions concerning the storage and supply of [DEM] conducted since May 2008 and the information we have exchanged, we are entering into this letter of Intent in order to develop an Agreement under which [FFCC] will store purchased DEM for [Lonza] and will additionally supply FFCC-manufactured DEM to Lonza in accordance with Lonza's specifications far the product.

> This Letter of Intent contemplates that the parties will negotiate and execute a definitive supply agreement (the "Agreement") on or before October 1, 2008. It is the intent of the parties to meet to begin preparation of the Agreement by August 31, 2008.

> This Letter of Intent is intended to confirm our understanding of the principal terms and conditions of the transaction and our mutual willingness to proceed in good faith to work toward the execution of a definitive Agreement consistent with these terms.

*Id*. Under the heading "Bridge Strategy," the LOI set forth terms under which Lonza would rent tanks located at FFCC's Batesville facility for the storage of DEM, and under the heading "Long Term Supply Strategy," the LOI provided:

> FFCC agrees to configure and modify existing manufacturing equipment to a state necessary to produce DEM to the quality that meets the specifications outlined in Table 1.

> Lonza agrees to purchase DEM from FFCC at the following volumes: 1,000 metric tons in 2009, 80% of its worldwide demand for 2010 and 80% of its worldwide demand for 2011. Lonza estimates that the expected DEM usage in 2009 is 1800

metric tons, and 900 metric tons in 2010 followed by 800 metric tons in 2011. Like the second draft letter of intent dated August 1, 2009, the executed LOI set forth an initial price per pound or kilogram for 1,000 MT tons of annual volume, but it also provided a price/volume chart for prices based on annual purchases of (1) more than 1250 MT, (2) 1,000 to 1250 MT, (3) 700 to 1,000 MT, (4) 400 to 700 MT, and (5) less than 400 MT.  *See id.*

The LOI also provided:  "FFCC and Lonza agree to develop a mutually acceptable formula that allows quarterly adjustments of the price based on raw material prices and changes in freight charges.  Such formula will be documented in the Agreement."  *Id*.  Additionally, the LOI set April 1, 2009 as a "best-efforts" start up date and set forth delivery and payment terms. *Id*.

After the parties executed the LOI, Luggen and Fry continued negotiations for a long-term supply agreement.  In September 2008, FFCC prepared and delivered to Lonza the first draft of long-term supply agreement.  *See* Def's Ex. #4, Allgeier Dep. at 70.  Unlike the LOI, the first draft provided start and end dates for an initial one-year term and stated that the agreement would  continue year-to-year, subject to termination by either party upon 90-days written notice. Def's Ex. #10.  Additionally, the first draft introduced terms not included in the LOI–such as "minium percentage required" and  "maximum annual quantity limit." *Id*.  Under the new terms, Lonza would purchase and FFCC would supply a minimum of 80% of  Lonza's annual DEM requirements during the term of the contract, but FFCC would not be obligated to supply more than 3.5 million pounds of DEM during a calendar year.  *Id*.

In November 2008, Luggen sent Allgeier an e-mail message stating:  "Price formula: Concept is ok, but details have to be discussed (units, what is base . . . )."  Def's Ex. 24.  Luggen

also sent a revised draft agreement that utilized Lonza's template for a "raw material supply agreement."  *See id.*, *see also* Plf's Ex. #1, Fry Dep. at 123-124.   The parties continued negotiating terms and conditions that would govern their long-term supply agreement, and they disagreed about a number of items. *See* Plf's Ex. #1, Fry Dep. at 126("We had [discussions] because we didn't agree with these–all of these terms, and they were different than our terms and conditions, which we provided to Lonza, and we wanted to work out an acceptable remedy to that disagreement.").

On December 15, 2008, Allgeier sent a revised draft agreement to Luggen, along with an email message stating: "I have attached the contract that you provided for review.  As you will [see] we have marked it up.  The major changes were in the terms and conditions section which we attempted to melt your requirements with ours."  Def's Ex. #25.  In deposition, Fry acknowledged that as of December 15, 2008, the parties were still attempting to agree to a formula for quarterly price adjustments. *See* Plf's Ex. #1, Fry Dep. at 133.

On December 29, 2008, Luggen responded to Allgeier's December 15 draft, stating: "To be honest, I was quite 'surprised' how much you've extended it.  I've added some terms that I consider as reasonable . . . . Before we invest a lot of work in this draft, I suggest we have a phone call to get a common understanding on the purpose of this agreement and decide on format afterwards."  Plf's Ex. #1, Fry Dep., attached Ex. #13.

On February 13, 2009, Allgeier sent Luggen an updated draft agreement, along with an email message stating: "We have tried to make the contract as simple as possible.  But with the number of people who have input [it is difficult to keep it simple]."  Plf's Ex. #1, Allgeier Dep. at 86 and attached Ex. #7.

10

On February 23, 2009, Fry sent Lonza  a sixth draft of the supply agreement, which contained several terms and clauses that were not referenced in the LOI, including compliance with laws, acceptance and rejection, taxes, intellectual property, limitation and liability and warranties, *force majeure,* confidentiality, product stewardship, and more.  *See* Plf's Ex. #1, Allgeier Dep., attached Ex. #9.

In deposition, Fry recalled that by February 2009, he was "starting to get nervous." Def.'s Ex. #6, Fry Dep. at 142.  He testified: "It's just getting close to the time when the [DEM] plant would become operational, and we didn't have a supply agreement in place.  We were still working on the agreement we had with the letter of intent."  *Id*.

On April 27, 2009, Allgeier e-mailed Luggen, stating: "[Your group at Riverside is beginning to take the DEM purchased from Eastman and stored at our site.  I believe it would be in everyone's best interest to have a contract in place for Lonza's demand.  Could you revise the contract to meet your needs and return it so we can work it through our legal organization." Def's Ex. #32.

Luggen responded to Allgeier on April 29, 2009, stating: "Sorry for my late response. The reason is that we are really struggling to find a good solution.  One reason is the legal framework of the contract and the other is the economic situation.  Our customer [is] optimizing [its] inventory and therefore we will produce less material than we thought.  For a fair discussion, I would like to have a reliable forecast, so that we do not discuss about virtual figures and face  the reality. I [will] try to come up with a new forecast [by] the end of the week."  *Id*. In reply, Allgeier offered to visit Riverside and work with Luggen to complete the contract. Def's Ex. #4, Allgeier Dep. at 99, Def's Ex. #33.

11

According to Allgeier's notes from a telephone conference held June 3, 2009, Luggen informed Allgeier that Lonza's demand for DEM in 2009 dropped to 200 to 250 MT because Lonza's DEM recovery rate had improved and because Merck was ordering less TTL than expected.  *See* Def's Ex. #34.  Allgeier asked Luggen to give him his "best guess" as to Lonza's DEM demand for 2010 and 2011, and Luggen replied "700 MT . . . if nothing changes."  *Id*. Allgeier wrote: "I told him it was important to have a contract in place to protect Lonza from not having DEM available.  He understands the need to have a contract in place and will send me a revised contract reflecting the change in demand next week."  *Id*.

In July 2009, Lonza communicated to FFCC that it wanted to purchase 60 MT of DEM, and it requested a purchase price.   In an email message to other FFCC personnel, Fry stated: "Lonza wants to spot buy 60 MT (3 truckloads) of DEM and has requested a price.  They also requested the lowest volume at which we would offer 'contract' pricing."  Def's Ex. #36.  FFCC quoted Lonza a price of $1.55 per pound, which varied from the price $1.48 per pound set forth in the LOI for annual volumes less than 400 MT.   Fry explained in deposition that he did not quote a price based on the LOI because the draft supply agreement was "fallow" and laying dormant.  *See* Def's Ex. #6, Fry Dep at 156.

In 2010, Lonza made another "spot" purchase from FFCC for 79 MT of DEM.  At some point, Merck withdrew its business from Lonza, and Lonza sold the Riverside facility on November 2, 2010.

## Count I - Breach of Express Contract

FFCC contends that the LOI signed by the parties on August 25, 2008 constitutes a "valid and binding contract for Lonza to purchase 1,000 metric tons of FFCC manufactured DEM from

FFCC in 2009 per the price structure set forth therein."  Compl., ¶ 17.  FFCC further alleges that Lonza only purchased 60 metric tons of FFCC-produced DEM in 2009, thereby breaching the parties' agreement.

Lonza maintains that the LOI was no more than an agreement to negotiate a future  long-term supply contract.  According to Lonza, the undisputed facts demonstrate that the parties never had a meeting of the minds regarding all terms of a long-term supply agreement, thus the requirement of mutual assent is lacking.

Under Arkansas law,[4] the essential elements of a contract are (1) competent parties, (2) subject matter, (3) legal consideration, (4) mutual agreement, and (5) mutual obligations.  *City of Dardanelle v. City of Russellville,*  372 Ark. 486, 490-491, 277 S.W.3d 562, 566 (2008)(citing *Williamson v. Sanofi Winthrop Phars*., 347 Ark. 89, 60 S.W.3d 428 (2001)).  The Supreme Court of Arkansas has articulated two principles that govern the determination of whether parties entered a valid contract: (1) a court cannot make a contract for the parties but can only construe and enforce the contract that they have made; and if there is no meeting of the minds, there is no contract; and (2) to make a contract, there must be a meeting of the minds as to all terms, using

---

[4]The parties do not specifically address which state's law governs the substantive issues in this case, but they cite Arkansas law to support their arguments.  When federal jurisdiction is based on diversity of citizenship, a federal court looks to the choice-of-law principles of the forum state–in this case Arkansas--and applies those principles as the forum state would.  *Simpson v. Liberty Mut. Ins. Co.*, 28 F.3d 763, 764 (8th Cir. 1994).  In contract actions, when an agreement does not specify the law to be applied, Arkansas Courts have applied the  "significant contacts" test, which requires an inquiry into the nature and quantity of each state's contacts with the transaction at issue.  *Fuller v. Hartford Life Ins. Co.*, 281 F.3d 704, 706 (8th Cir. 2002); *Southern Farm Bureau Casualty Ins. Co. V. Craven*, 79 Ark. App. 423, 89 S.W.3d 369 (2002).  Arkansas and Pennsylvania appear to be the only states with a connection to this case, and the Court has insufficient information to determine which state has the most significant contacts with the transactions at issue.

objective indicators.  *See Williamson*, 347 Ark. at 98, 60 S.W.3d at 434(citing *Crain Industries,*

*Inc. v. Cass*, 305 Ark. 566, 810 S.W.2d 910 (1991)).  Determining whether parties had a meeting

of the minds requires  individual inquiry into each party's understanding of the terms of the

alleged contract, using an objective standard.  *See Williamson,* 347 Ark. at 98-99, 60 S.W.3d at

433-434.

In *Arkansas Beverage Co. v. Dr. Pepper Bottling Co. of Little Rock*, 249 Ark. 752. 461

S.W.2d 571 (1971),  the Supreme Court of Arkansas cited governing law and factors that should

be considered in determining whether a definite contract has been entered:

> If the party sought to be charged intended to close a contract prior to the formal
> signing of a written draft, or if he signified such an intention to the other party, he
> will be bound by the contract actually made, though the signing of the written draft
> be omitted.  If, on the other hand, such party neither had nor signified such an
> intention to  close the contract until it was fully expressed in a written instrument,
> and attested by signatures, then he will not be bound until the signatures are affixed.
>
> The expression of the idea may be attempted in other words:  If the written draft is
> viewed by the parties merely as a convenient memorial or record of their previous
> contract, its absence does not affect the binding force of the contract. If, however, it
> is viewed as the consummation of the negotiation, there is no contract until the
> written draft is finally signed.
>
> In determining which view is entertained in any particular case, several
> circumstances may be helpful, as whether the contract is of that class which are
> usually found to be in writing, whether it is of such nature as to need a formal writing
> for its full expression, whether it has few or many details, whether the amount
> involved is large or small, whether it is a common or unusual contract, whether the
> negotiations themselves indicate that a written draft is contemplated as the final
> conclusion of the negotiations. If a written draft is proposed, suggested, or referred
> to during the negotiations, it is some evidence that the parties intended it to be the
> final closing of the contract.

*Arkansas Beverage Co,* 249 Ark. at 762-763, 461 S.W.2d at 576(citing *American Bentonite*

*Corporation v. Clark Equipment Co.*, 43 F.2d 392 (D.C. Mich. 1928)(quoting *Mississippi*

*Steamship Co. v. Swift*, 86 Me. 248, 29 A. 1063, 1066 (1894)).

The crucial question in this case is whether the parties intended the LOI to serve as an agreement to negotiate a future, long-term supply contract or whether they intended the LOI as a long-term supply contract that would be memorialized in a more formal agreement.  The express language of the LOI states that the parties contemplated further discussions before the execution of a "definitive" supply agreement.  And under the heading "Purpose," the LOI states that the parties "are entering into this [LOI] in order to develop an Agreement under which [FFCC] will store purchased DEM for [Lonza] and will additionally supply FFCC manufactured DEM to Lonza . . . " Compl., Ex. B.  Additionally, the LOI states that the document  "is intended to confirm our understanding of the principle terms and conditions of the transaction and our mutual willingness to proceed in good faith to work toward the execution of a definitive Agreement consistent with those terms."  *Id*.  The language of the LOI indicates that the parties intended it as an agreement to negotiate a future contract.

Under the heading "Long Term Supply Strategy," the LOI states that Lonza agrees to purchase 1,000 MT of DEM from FFCC in 2009.  However, the LOI contains other statements that suggest Lonza retained the option of purchasing less than 1,000 MT of DEM in 2009.  Specifically, the LOI provides an initial price of $1.39 per pound or $3.04 per kilogram for 1,000 MT "of annual volume," but it also contains a price/volume chart containing prices for  "annual volumes" less then 1,000 MT.

FFCC contends that the LOI contained all essential, material terms needed for an enforceable contract, and it set forth a procedure for finalizing "some auxiliary terms." However, the LOI states that the parties would develop a mutually acceptable formula for

15

quarterly price adjustments based on raw material prices and changes in freight charges that would be "documented in the Agreement." *Id*.  FFCC argues that the unresolved price-adjustment formula  is of no consequence because the LOI provides "an objectively ascertainable figure with set parameters."   But the LOI is void of any index for determining values or quantities necessary for a price-adjustment formula, and it specifically reserves the development of such a formula for future negotiations.

In November 2008, the parties were still attempting to agree on a  price- adjustment formula.  *See* Def's Ex. #24 (Luggen e-mail).   According to Fry, negotiations went "back and forth," and "[w]ell into the negotiation, . . . Luggen asked some questions . . . and we recognized that the formula contemplated would not work properly, and we subsequently made changes to it during the negotiations."  Def.'s Ex. #6, Fry Dep. at 121-122.   Although the parties may have reached an agreement in principle regarding the concept of a price adjustment formula, the undisputed evidence shows that when they signed the LOI, they had not reached a definitive agreement.  Because the parties had no agreement regarding a mechanism for determining price, the LOI cannot constitute a contract.  *See Hunt v. McIlroy Bank and Trust,* 2 Ark. App. 87, 90, 616 S.W.2d 759, 761 (Ark. App. 1981)("It is well settled that in order to make a contract there must be a meeting of the minds as to all terms.").

The parties' actions taken after they signed the LOI provide further evidence that they did not intend that preliminary agreement to serve as a binding contract.  For months, the parties endeavored to negotiate a definitive long-term supply agreement, and they produced six draft agreements that included substantive terms that were absent from the LOI.  The new and additional terms included automatic renewal and termination clauses, and the first draft required

that  Lonza would purchase and FFCC would supply a minimum of 80% of  Lonza's annual

DEM requirements.  *See* Def's Ex. #10.   Fry recalls that the new terms arose "through

discussions back and forth between the companies about how much material was contemplated

that Lonza would need."  Def's Ex. #6, Fry Dep. at 119; *see also* Def's Ex. #4, Allgeier Dep. at

73-74.  According to Fry, such terms "are open to negotiation or routinely negotiated in the

course of completing a supply agreement."  *Id.* at 120.

FFCC argues that Lonza's internal communications following execution of the LOI

demonstrate  Lonza's clear intention and admission that the LOI constituted a contract,

commitment, and promise.  On June 2, 2009 Luggen sent a e-mail message to other Lonza

employees, stating: "I'm still struggling with DEM for TTL, because last year, we promised a far

too large quantity to FFCC (at least 1,000 mt/a) and now we are using much less."  Plf's Ex. #4,

Dolan Dep, attached Ex. #44.  Under Arkansas law, the formation of a contract requires a

meeting of the minds on all terms*, using objective indicators, independent of the subjective

opinions or understanding of the parties.  *See Ward v. Williams*  354 Ark. 168, 180, 118 S.W.3d

513, 520 (2003)("Indeed, this court made it clear more than a decade ago that though the phrase

'meeting of the minds' may have been used in our decisions, we meant objective indicators of

agreement and not subjective opinions.").  Mutual agreement or a meeting of the minds is not

determined by the subjective beliefs or secret intentions of the parties, but by their expressed or

manifested intentions.  Here, the parties' continued negotiations regarding the terms of a long-

term supply contract revealed that they did not intend the LOI to serve as binding agreement.

FFCC argues that the parties partially performed the LOI–specifically terms set forth

under the bridge strategy, which provided that FFCC would store DEM that Lonza had

purchased from Eastman.  FFCC contends that the parties' "partial performance" shows that they intended to be bound by the LOI.

The LOI segregates paragraphs entitled "Bridge Strategy" and "Long Term Supply Strategy," and the terms of the separate strategies share nothing in common.  The parties' conduct with respect to the *storage* of DEM that Lonza purchased from Eastman simply provides no basis for finding that they agreed to terms of a long-term *supply* agreement.   Furthermore, the parties' conduct with respect to DEM sales indicates the absence of a long-term supply agreement.  It is undisputed that in July 2009, Lonza requested to purchase 60 MT of DEM, and FFCC quoted a price higher than the price provided in the LOI.

FFCC argues that the question of whether Lonza acted in good faith in negotiating a definitive supply agreement "should at the very least create a fact question on Lonza's breach mandating denial of summary judgment."  Plf's Resp. at 10.  FFCC reports that in July and August 2008, when the parties were negotiating the terms of the LOI, Lonza was pursuing other DEM suppliers.   FFCC also presents a copies of e-mail communications among Lonza representatives that indicate a plan to "squeeze" as much out of FFCC and Eastman as possible and eventually let FFCC know they would be bidding against someone else.[5]

In its complaint, FFCC charges that Lonza breached a supply contract that required it to purchase 1,000 MT of DEM, it does not assert a claim that Lonza breached an agreement to use

---

[5]FFCC points to evidence that in June 2008, before the parties executed the LOI, Lonza knew that FFCC required a commitment from Lonza before it would go forward with capital expenditures necessary for the construction of a DEM production facility.  FFCC also provides copies of internal email messages among Lonza representatives in May and June 2008, indicating that Lonza purposefully gave FFCC vague information regarding the quantity of DEM it required in order to keep FFCC "hot" and "engaged."

best efforts or to negotiate in good faith toward a definitive supply agreement.  Even if FFCC

asserted such a claim, and assuming that breach of an agreement to negotiate in good faith is

actionable under Arkansas law,[6] the LOI's reference to the parties' "mutual willingness to

proceed in good faith to work toward the execution of a definitive Agreement," is simply too

vague to constitute a legally binding agreement.  The LOI contains no language setting forth the

parameters of a duty to negotiate in good faith, nor does it preclude Lonza from considering

other DEM suppliers during negotiations.  Without a specific standard or objective criteria by

which to measure good faith negotiations, the Court has no basis for determining the existence of

a breach or for giving an appropriate remedy.  *See City of Dardanelle v. City of Russellville,* 372

Ark. 486, 491, 277 S.W.3d 562, 566 (2008)(holding that joint resolution to "cooperate" in

pursuit of funding for a sewer line was too vague to constitute a legally binding agreement).

Based on the undisputed evidence presented, the Court finds that no reasonable jury

could conclude that the parties' August 25, 2008 LOI constitutes a binding, enforceable supply

contract.  Accordingly, Lonza is entitled to summary judgment under Count I.

## Count II - Breach of Implied Contract

FFCC alleges: "[I]n the event that it is found that an express contract was not formed

between FFCC and Lonza, Inc.  for the supply and purchase of 1,000 metric tons of DEM in

---

[6]An *express* contractual duty to negotiate in good faith is distinct from an implied duty of good faith and fair dealing.  Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement, but the implied covenant of good faith and fair dealing in the performance of an *existing* contract stems only from contractual obligations and does not extend to pre-contractual negotiations.  *See Hodge v. First Nat. Bank in Osceola,* 1994 WL 188860, *4 (Ark. App. May 4, 1994)(citations omitted).

19

2009, then an enforceable implied contract was formed for FFCC to supply and Lonza, Inc. to purchase 1,000 metric tons of DEM based on the parties' conduct and course of dealing . . . . " Compl., ¶ 27.

"A contract implied in fact does not describe a legal relationship different from that created by an express contract." *Steed v. Busby*, 268 Ark. 1, 7, 593 S.W.2d 34, 38 (1980) (citations omitted).   The elements required for a contract are identical whether they are expressly stated or implied in fact.  *See K.C. Properties of N.W. Arkansas, Inc. v. Lowell Inv. Partners, LLC,* 373 Ark. 14, 28-29, 280 S.W.3d 1, 13 (2008)(citing 1 Williston, Contracts § 3 (3d ed.1957)).   For reasons previously stated, the undisputed evidence regarding the parties' conduct and course of dealing demonstrates that they did not intend that the LOI would serve as a enforceable supply contract.  Accordingly, Lonza is entitled to summary judgment on Count II.

## Count III - Promissory Estoppel

FFCC asserts that it is "entitled under the doctrine of detrimental reliance and promissory estoppel to recover its lost profits from Lonza's . . . failure to abide by its agreement to purchase 1,000 metric tons of DEM."  Compl., ¶ 35.

"Under Arkansas law, promissory estoppel requires that the plaintiff clearly show four elements: '(1) the making of a promise, (2) intent by the promisor that the promise be relied upon, (3) reliance upon the promise by the promisee, and (4) injustice resulting from a refusal to enforce the promise.'"  *Curtis Lumber Co., Inc. v. Louisiana Pacific Corp.*  618 F.3d 762, 780 (8th Cir. 2010)(quoting *In re Hilyard Drilling Co.*, 840 F.2d 596, 602 (8th Cir.1988)). "[T]he party asserting estoppel must prove it strictly, there must be certainty to every intent, the facts constituting it must not be taken by argument or inference, and nothing can be supplied by

intendment." *K.C. Props. of N.W. Ark., Inc. v. Lowell Inv. Partners, LLC*, 373 Ark. 14, 280

S.W.3d 1, 14 (2008)(citing *Ward v. Worthen Bank & Trust Co.*, 284 Ark. 355, 681 S.W.2d 365

(1985)).

      Lonza asserts that FFCC is unable to show that Lonza made a promise to purchase 1,000

MT of DEM in 2009.  A "promise" is "a manifestation of intention to act or refrain from acting

in a specified way, so made as to justify a promisee in understanding that a commitment has

been made." RESTATEMENT (SECOND) OF CONTRACTS § 2 (1981); *see also Fairpark, LLC v.*

*Healthcare Essentials, Inc.*, 2011 Ark. App. 146, 14 , — S.W.3d — (2011)(adopting

Restatement (Second) of Contracts § 2 definition of "promise" in connection with promissory

estoppel claim).

      FFCC contends that by signing the LOI, Lonza promised to purchase 1,000 metric tons of

DEM from FFCC in 2009 and 80% of its DEM requirements in 2010 and 2011.   But for reasons

previously explained, the parties'  LOI was a preliminary step toward the negotiation of a

definitive, long-term supply agreement; it simply cannot be construed as an assurance or promise

sufficient to give rise to an action based upon detrimental reliance or promissory estoppel.  *See*

*Bill & George Wilson, Inc. v. Southwest Dev. Co.*, No. CA-83-368, 1984 WL 1760 (Ark. Ct.

App.,  July 5, 1984)(holding that negotiations toward a final agreement could not be construed to

be assurances or promises sufficient to support an action for detrimental reliance or promissory

estoppel); *see also 168th and Dodge, LP v. Rave Reviews Cinemas, LLC,* 501 F.3d 945, 955 (8th

Cir. 2007)(applying Nebraska law and noting that promissory estoppel cannot be based on

preliminary negotiations and discussions or an agreement to negotiate the terms of a contract).

      FFCC asserts:  "Not only was the promise set forth in the LOI, but it was also

specifically stated in conversations and emails between FFCC and Lonza . . . . " Plf's Br. at 20-
21.  The Court has reviewed material referenced in FFCC's brief and statement of facts and finds
no instance where  Lonza communicated to FFCC that it would purchase 1,000 MT or any
specific quantity of DEM.  To the contrary, the evidence shows that FFCC knew that Lonza's
DEM requirements were uncertain and depended upon Merck's requirements for TTL and the
success of  Lonza's DEM recycling process.[7]  Furthermore, the evidence shows that FFCC did
not believe that it had a firm commitment from Lonza.  On April 29, 2009, Allgeier sent Luggen
an email stating: "I believe it would be in everyone's best interest to have a contract in place for
Lonza's demand."  Def's Ex. #32.

FFCC correctly notes that Lonza understood that it wanted a commitment  before it
expended money on a DEM production facility.  However, promissory estoppel is based upon a
promise which the promisor should reasonably expect to induce action or forbearance on the
party of the promissee.   Arkansas law requires that facts constituting promissory estoppel must
not be taken by argument or inference and that nothing can be supplied by intendment, and
FFCC has failed to come forward with evidence that Lonza promised to purchase a specific
quantity of

DEM.  Accordingly, the Court finds that Lonza is entitled to summary judgment on Count III.

---

[7]*See* Plf's Ex. #3, Dolan Dep, attached Ex. #30 (acknowledging that the Lonza's DEM
requirements depended heavily on the recycle rate at Lonza's Riverside facility); Def's Ex. #6,
Fry Dep. at 63 (acknowledging that as of July 2008, Lonza's DEM requirements were
uncertain); Def's Ex. #4, Allgeier Dep. at 103 (acknowledging that Lonza required DEM solely
for a product it manufactured for Merck, which presented a risk to FFCC); Plf's Ex. #2, Allgeier
Dep. at 62-63 and attached Ex. #5 (FFCC meeting notes dated August 8, 2008 stating Lonza's
estimated annual demand for years 2009 through 2011 to be 400 to 500 MT and that FFCC
would be providing less product to Merck).

**III.**

For the reasons stated, the Court finds that Defendant's motion for summary judgment (docket entry #52, filed under seal) should be and it is hereby GRANTED.  Pursuant to the judgment entered together with this order, this action is DISMISSED WITH PREJUDICE.

IT IS SO ORDERED THIS 13TH DAY OF SEPTEMBER, 2012.

/s/Susan Webber Wright
UNITED STATES DISTRICT JUDGE